ALINA HABBA
United States Attorney
DAVID V. SIMUNOVICH
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
Tel. (973) 645-2736

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MICHAEL ANDRIOLA,<br><br>  Plaintiffs,<br><br>v.<br><br>FERREIRA CONSTRUCTION CO., INC. *et al.*,<br><br>  Defendants. | HON. GEORGETTE CASTNER<br><br>Civil Action No. 23-3834 (GC) (JBD) |

### UNITED STATES' STATEMENT OF INTEREST REGARDING DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT BASED ON THE ALLEGED UNCONSTITUTIONALITY OF THE *QUI TAM* PROVISIONS OF THE FALSE CLAIMS ACT

In accordance with 28 U.S.C. § 2403(a), the United States submits its statement of interest with respect to Defendants' motion to dismiss the Amended Complaint to address Defendants' contention that the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–33, violate the Appointments Clause of Article II of the Constitution.[1]

---

[1] This brief addresses only Defendants' constitutional challenge. The United States takes no position on the other arguments raised by defendants in their Motion.

1

## ARGUMENT

Defendants argue that Relator's litigation of this declined *qui tam* case violates the Appointments Clause of Article II of the U.S. Constitution. Defs. Memo. of Law in Support of Mtn. to Dismiss Relator's Am. Compl. or, in the Alternative, to Disqualify Counsel and to Award Attorneys' Fees and Costs, ECF Doc. No. 33-1 ("Defs. MTD") at 32-34. Every court of appeals to have addressed the question has held that the FCA's *qui tam* provisions are consistent with Article II. *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804–07 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–58 (5th Cir. 2001) (*en banc*); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 749–59 (9th Cir. 1993), *cert. denied*, 114 S. Ct. 1125 (1994); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993) (explaining, in rejecting an Article III challenge, that the *qui tam* "provisions do not usurp the executive branch's litigating function"); *but see United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, No. 24-50176, 2025 WL 939890, at *11 (5th Cir. Mar. 28, 2025) (Duncan, J., concurring) (opining, in a concurrence, that the "FCA's *qui tam* device" has "constitutional flaws," but recognizing that binding Fifth Circuit precedent required that the Court accept the constitutionality of the *qui tam* provision).

Almost all district courts, including those within the Third Circuit, have followed suit. *See, e.g.*, *United States ex rel. Penelow v. Janssen Prods., LP*, No. 12-

7758 (ZNQ), 2025 WL 937504, at *12 (D.N.J. Mar. 28, 2025); *United States ex rel. Resolution NJ LLC v. Riverside Med. Grp., P.C.*, No. 22-cv-4165 (SDW), 2024 WL 4100372, at *5 (D.N.J. Sept. 6, 2024); *United States ex rel. Butler v. Shikara*, 748 F. Supp. 3d 1277, 1294-97 (S.D. Fla. 2024); *United States ex rel. CLJ, LLC v. Halickman*, No. 20-CV-80645, 2024 WL 3332055, at *21 n.5 (S.D. Fla. June 14, 2024); *United States ex rel. Wallace v. Exactech, Inc.*, No. 7:18-cv-01010-LSC, 2023 WL 8027309, at *4 (N.D. Ala. Nov. 20, 2023); *United States ex rel. Thomas v. Mercy Care*, No. CV-22-00512, 2023 WL 7413669, at *4 (D. Ariz., Nov. 9, 2023); *United States ex rel. Miller v. Manpow, LLC*, No. 2:21-cv-05418, 2023 WL 8290402, at *2-5 (C.D. Cal. Aug. 30, 2023); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla. 2014); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212 (M.D. Fla. 1999); *but see United States ex rel. Zafirov v. Fla. Med. Assocs., LLC,* 751 F. Supp. 3d 1293 (M.D. Fla. 2024).[2]  This Court likewise should reject Defendants' arguments that the *qui tam* provisions of the FCA are unconstitutional.

---

[2]   An appeal in *Zafirov* is currently pending before the Eleventh Circuit (No. 24-13581).  In addition, in the two instances in which a district court has squarely addressed this argument post-*Zafirov*, both courts expressly declined to follow that decision.  *See, e.g.*, *Penelow*, 2025 WL 937504, at *12 (declining to follow *Zafirov*, and describing it as a "singular non-precedential and out-of-circuit court decision"); *United States ex rel. Adams v. Chattanooga Hamilton Cnty. Hosp. Auth.*, No. 21-CV-84, 2024 WL 4784372, at *2-3 (E.D. Tenn. Nov. 7, 2024) (declining to follow *Zafirov*, finding it "unpersuasive" and primarily reliant on "selections of dissents, concurrences, and law review articles").

## I. The FCA's *Qui Tam* Provisions Do Not Violate Article II of the Constitution

### A. Qui Tam *Provisions Have Always Been Consistent with Article II*

As the Supreme Court observed, "'[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government.'" *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943) (quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)). Since the Founding, *qui tam* provisions like the ones in the FCA have been understood to be consistent with the Constitution. When Congress enacted the FCA in 1863, it included *qui tam* provisions following a "long tradition of [such] actions in England and the American Colonies." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens* ("*Stevens*"), 529 U.S. 765, 774 (2000). The essence of the *qui tam* mechanism is that a private party may bring suit because of a wrong done to the sovereign and is entitled to a share of the recovery if the action is successful. The deep historical roots of *qui tam* provisions demonstrate that the FCA does not violate the Constitution.

*Qui tam* statutes were among the first pieces of legislation enacted in our Nation's history. The First Congress passed, and President George Washington signed, a "considerable number" of such statutes, *see Stevens*, 529 U.S. at 776–77 & nn.5–7, and subsequent early Congresses and Presidents did the same. *See* Act of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232, 239 (2d Cong.) (authorizing actions against certain postal employees and providing that recoveries be shared between the

4

United States and the "the person or persons informing and prosecuting" the action); Act of Mar. 1, 1793, ch. 19, § 12, 1 Stat. 329, 331 (2d Cong.) (providing that an "informant" could receive half of any recovery for violations of a statute regulating "Trade and Intercourse with Indian Tribes"); Act of Mar. 22, 1794, ch. 11, §§ 1–2, 4, 1 Stat. 347, 349 (3d Cong.) (sharing recoveries between the United States and any "person or persons, who shall sue for and prosecute" violations of a law against the international slave trade); Act of May 19, 1796, ch. 30, § 18, 1 Stat. 469, 474 (4th Cong.) (providing that an "informant" who pursues a claim for violations of a law regulating "Trade and Intercourse with the Indian Tribes" would receive a share of the recovery, unless the case "shall first be instituted on behalf of the United States," in which case the "informant" would not receive a share).[3] The Second Congress also enacted a law providing generally for the award of costs in *qui tam* cases, Act of May 8, 1792, ch. 36, § 5, 1 Stat. 277–78, suggesting that the *qui tam* mechanism was a well-established feature of federal law.

"These early congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning.'" *Haaland v. Brackeen*, 599 U.S. 255, 290 (2023) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723 (1986)); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 432 (2024). Indeed, the enactment of *qui tam* statutes immediately after the Founding clearly

---

[3] Additional examples include the Act of Apr. 2, 1802, ch. 13, § 18, 2 Stat. 139, 145 (7th Cong.; trading with Indians); Act of Apr. 29, 1802, ch. 36, §§ 3–4, 2 Stat. 171, 172 (7th Cong.; copyright); Act of May 3, 1802, ch. 48, § 4, 2 stat. 189, 191 (7th Cong.; mail carriers); Act of Mar. 26, 1804, ch. 38, § 10, 2 Stat. 283, 286 (8th Cong.; La. slave trade); Act of Mar. 2, 1807, ch. 22, § 3, 2 stat. 426 (9th Cong.; slave trade).

5

indicates that the Framers viewed them as fully compliant with Article II of the Constitution.

This long tradition of *qui tam* actions in the United States after the Framing provides "additional evidence that the doctrine of separated powers does not prohibit" this unique practice, given that "'traditional ways of conducting government . . . give meaning' to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)); *see also NLRB v. Noel Canning*, 573 U.S. 513, 537–38 (2014).

For example, the Slave Trade Act of 1794 ("1794 Act"), passed by the Third Congress and signed by President Washington, is directly analogous to the *qui tam* provisions of the FCA in that it authorized a bounty for private citizens suing others who for violating a law prohibiting the international slave trade. 1794 Act, ch. 11, §§ 1–2, 4, 1 Stat. 347, 349. The 1794 Act prohibited the modification of vessels in United States ports for the purpose of transporting enslaved people. As amended in 1800, the Act imposed the following penalties: (1) forfeiture of the vessel, (2) a fine of $2,000, to be divided equally between the United States and the informer, and (3) for every enslaved person carried, an additional fine of $200, also to be divided equally between the United States and the "informer." *See id.* at §§ 2, 4. Just like the modern FCA's *qui tam* provisions, the 1794 Act provided informers who had no independent injury with "both a bounty and an express cause of action," *see Stevens*, 529 U.S. at 776–77.

Copyright laws are another line of *qui tam* cases from the early to mid-19th century that provide strong evidence of the constitutionality of the *qui tam* provisions in the FCA. These cases involved private plaintiffs suing for copyright violations. As the Court noted in *Stevens*, the Act of May 31, 1790, ch. 15, 1 Stat. 124–25, § 2, allowed an author or proprietor to sue for and receive half of the penalty for a violation of copyright. *Stevens*, 529 U.S. at 776 n.5. Similarly, *qui tam* actions arose under subsequent copyright statutes, normally brought by an aggrieved party, though not necessarily so. *See Stevens v. Gladding*, 60 U.S. 64 (1856); *Backus v. Gould*, 48 U.S. 798 (1849); *Ferrett v. Atwill*, 8 F. Cas. 1161 (C.C.S.D.N.Y. 1846); *Reed v. Carusi*, 20 F. Cas. 431 (C.C.D. Md. 1845); *Dwight v. Appleton*, 8 F. Cas. 183 (C.C.S.D.N.Y. 1843); *Blunt v. Patten*, 3 F. Cas. 762 (C.C.S.D.N.Y. 1828).

Early *qui tam* enforcement also can be observed in many other areas of the law—a fact that is unsurprising given that the *qui tam* device was construed to allow "[a]lmost every fine or forfeiture," *Adams*, 6 U.S. (2 Cranch) at 341, to be recovered by a *qui tam* action. *See, e.g., The Emulous*, 8 F. Cas. 697 (D. Mass. 1813) (No. 4,479), *revised sub nom., Brown v. United States*, 12 U.S. 110 (1814) (seizure of private property belonging to citizens of an enemy nation); *Davison v. Champlin*, 7 Conn. 244, 244 (1828) (suit "in [the plaintiff's] own name and in behalf of the United States" to recover a penalty for a statutory violation, though the suit was dismissed because it was filed in state rather than federal court); *Nichols v. Newell*, 18 F. Cas. 199 (C.C.D. Mass. 1853) (successful *qui tam* action for patent violation); *Wolverton*

*v. Lacey*, 30 F. Cas. 417, 417–18 (N.D. Ohio 1856) (successful *qui tam* action against owner of a vessel for violating law requiring crew members to sign "shipping articles of agreement"). These additional examples of actions in which informers, regardless of whether they were injured, pursued a bounty for a harm done to the United States, closely resemble *qui tam* actions under the modern FCA.

Thus, *qui tam* suits were not novel when Congress enacted the FCA in 1863. *See* Act of Mar. 2, 1863, Ch. 67, 12 Stat. 696 (1863). To the contrary, they were common and accepted enforcement mechanisms. The FCA was originally designed to "stop[] the massive frauds perpetrated by large contractors during the Civil War." *United States v. Bornstein*, 423 U.S. 303, 309 (1976). It authorized *qui tam* suits to "be brought and carried on by any person, as well for himself as for the United States," and provided that such an action "shall be at the sole cost and charge of such person, and shall be in the name of the United States." Act of March 2, 1863, § 4, 12 Stat. at 698.

The contemporary version of the FCA retains the basic structure of the *qui tam* mechanism. Under the current statute, the Attorney General may bring a civil action to recover treble damages and civil penalties for a violation of the FCA. *See* 31 U.S.C. §§ 3729(a), 3730(a). Alternatively, a private person known as a "relator" may bring suit "for the person and for the United States Government." *Id.* § 3730(b)(1). The government then has at least 60 days, subject to extensions for good cause, to decide whether to intervene and take over the suit. *Id.* § 3730(b)(2), (3). If

8

the United States declines to intervene, "the person bringing the action [*i.e.*, the relator] shall have the right to conduct the action." *Id.* § 3730(b)(4)(B).[4]

In *Stevens*, the Supreme Court relied heavily on the deep historical roots of *qui tam* provisions and found this evidence "well nigh conclusive" in establishing that the FCA is consistent with Article III. 529 U.S. at 774–77. That same history is conclusive in establishing that the FCA is consistent with Article II. *See, e.g.*, *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 590 U.S. 448, 458-59 (2020) (examining history bearing on Appointments Clause issue); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) ("In separation-of-powers cases this Court has often 'put significant weight upon historical practice.'" (quoting *Noel Canning*, 573 U.S. at 524)). Indeed, the Justices who addressed the Article II issue in *Stevens* found the history equally dispositive of that issue. *See Stevens*, 529 U.S. at 801 (Stevens, J., joined by Souter, J., dissenting) (opining that history was "sufficient to resolve" any question whether the *qui tam* provisions were consistent with Article II). So, too, did the Fifth Circuit in an *en banc* decision rejecting an Article II challenge to the FCA's *qui tam* provision, explaining that it is "logically inescapable that the same history that was conclusive on the Article III question in *Stevens* . . . is similarly conclusive with respect to the Article II question." *Riley*, 252 F.3d at 752; *accord Butler*, 748 F. Supp. 3d at 1295 (explaining that "decades—nay, centuries—of litigation through the use of the qui tam device under the FCA

---

[4] As explained below, even though the relator "[has] the right to conduct the action," the Government retains significant control over the action. *See infra* at 10–11.

undercuts [defendant's] argument" against constitutionality of FCA's *qui tam* provisions).

### B. The False Claims Act Rests on Even Stronger Constitutional Footing Than Its Historical Analogs

The history shows that *qui tam* provisions are consistent with the original understanding of Article II, and the burden lies with the defendants to show that the FCA's *qui tam* provisions fall outside that historical tradition. The defendants cannot meet that burden. To the contrary, the FCA provides the Executive even greater control over *qui tam* actions than the Act's historical precursors. The constitutionality of the FCA thus follows *a fortiori* from the constitutionality of those precursors.

From the outset, every *qui tam* complaint under the FCA must be filed under seal and served on the government to ensure that the United States can investigate the matter and determine whether it wishes to "intervene and proceed with the action" or potentially move to dismiss it. 31 U.S.C. §§ 3730(b)(2), (c)(2)(A). Even if the government initially declines to intervene, it may still intervene at a later time for good cause. *See* 31 U.S.C. § 3730(c)(2)(D)(3); *United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 432–33 (2023). In addition, the government may move to dismiss an FCA action over a relator's objection. 31 U.S.C. § 3730(c)(2)(A); *Polansky*, 599 U.S. at 433. Such motions are subject to highly deferential review under Federal Rule of Civil Procedure 41(a); indeed, the Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases . . . even if the relator presents a credible assessment to the

10

contrary." *Polansky*, 599 U.S. at 437. The government may also settle a pending suit over the objections of the relator, *see* 31 U.S.C. § 3730(c)(2)(B); and veto a relator's proposed settlement or voluntary dismissal of his action, *id.* § 3730(b)(1).[5] Further, after declining to intervene, the United States is entitled to receive copies of all pleadings and transcripts, *id.* § 3730(c)(3), and to stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4).

Notably, early *qui tam* statutes had far fewer controls over relators than the modern FCA. For example, in a case involving a customs inspector who was indicted for violating the 1790 customs act by an informer suing in the name of the United States, the Washington Administration determined that, while it could pardon the customs inspector, it had no power to nullify the informer's award. *See* Nitisha Baronia *et al.*, *Private Enforcement at the Founding and Article II*, Cal. L. Ref. (forthcoming 2026), at 5–6, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4821934 (citing Letter from Richard Harrison to Alexander Hamilton (24 May 1791), in 8 *Papers of Alexander Hamilton* 352–54 (Harold Syrett ed., 1965)). In contrast, under the FCA, the Executive Branch can dismiss a *qui tam* action completely, quashing any right relator has to a recovery. The additional control mechanisms that Congress included in the FCA reflect that Congress—

---

[5] *See United States ex rel. Michaels v. Agape Senior Community, Inc.*, 848 F.3d 330, 339 (4th Cir. 2017) ("We agree with the district court, and with the Fifth and Sixth Circuits, that the Attorney General possesses an absolute veto power over voluntary settlements in FCA *qui tam* actions.").

11

rather than merely accepting the *qui tam* device as an unexamined relic—made a conscientious effort to strike an appropriate balance between incentivizing relators to come forward and respecting the Executive's primary role of enforcement through the Justice Department's controls.  And if early *qui tam* statutes, which lacked such controls, were understood to pose no Article II problem, then the FCA's *qui tam* provisions cannot be understood to pose any Article II problem either.

For these reasons, the FCA's *qui tam* provisions are consistent with Article II, and Defendants' arguments to the contrary should be rejected.[6]

## II. The FCA's *Qui Tam* Provisions Do Not Violate The Appointments Clause

Defendants argue that the FCA's *qui tam* provisions are inconsistent with the Appointments Clause, which specifies the permissible means of appointing "Officers of the United States" to public offices "established by Law."  U.S. Const. art. II, § 2, cl. 2; Defs. MTD at 32-34.  That argument fails for the same reason as above.  The history of *qui tam* provisions, dating to the Founding, forecloses the contention that the FCA's *qui tam* provisions violate the Appointments Clause.

---

[6]    The constitutional question presented at this juncture is only whether subjecting defendants to suit at Relator's behest is consistent with Article II.  Any consideration of whether the statutory limits on the government's settlement and dismissal authorities could create an Article II problem would be premature because the government has not sought to exercise those authorities in this case.  Further, should the Court conclude that the FCA improperly constrains the government from exercising those authorities, the appropriate remedy would be to declare those limits unconstitutional, not to invalidate the FCA's *qui tam* provisions in their entirety.

Moreover, for a position to be a federal office, and thus subject to the Appointments Clause, it must be "continuing," which "embraces the ideas of tenure, duration, emolument, and duties." *United States v. Germaine*, 99 U.S. 508, 511-12 (1878). A hallmark of an office is that its "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, J.); *see also Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 111 (2007) (providing that a key consideration for whether an office qualifies as continuing is that "the position's existence should not be personal.").[7] But, FCA *qui tam* relators do not "occupy a continuing position established by law," as would be required for them to be considered officers of the United States. *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (internal quotation omitted).

The Supreme Court has long applied this understanding of a continuing position. In *Germaine*, for example, the Court in 1878 held that civil surgeons appointed to examine pensioners and applicants for pensions were not officers because their "duties are *not* continuing and permanent, and they *are* occasional and intermittent." 99 U.S. at 512. As the Court explained, "[t]he surgeon is only to act . . . in some special case, as when some pensioner or claimant of a pension presents himself for examination. He may make fifty of these examinations in a year, or none." *Id.*

---

[7] This opinion of the Office of Legal Counsel is available at 2007 WL 1405459.

13

In *Auffmordt v. Hedden*, the Court, relying on *Germaine*, held that a merchant appraiser selected to reappraise goods pursuant to a customs statute likewise did not hold an office:

> The merchant appraiser is an expert. . . . He is selected for the special case. He has no general functions, nor any employment which has any duration as to time, or which extends over any case further than as he is selected to act in that particular case. . . . His position is without tenure, duration, continuing emolument, or continuous duties, and he acts only occasionally and temporarily. Therefore, he is not an 'officer,' within the meaning of the [Appointments Clause].

137 U.S. 310, 326–27 (1890); *see also Sheboygan Cnty. v. Parker*, 70 U.S. 93, 96 (1865) (certain persons appointed by legislature were not "county officers" because "they do not exercise any of the political functions of county officers," nor do they "'continuously, and as a part of the regular and permanent administration of the government, any important public powers, trusts, or duties'" (quoting *State ex rel. Atty. Gen. v. Kennon*, 7 Ohio St. 546, 562–63 (1857)); *cf. United States v. Hartwell*, 73 U.S. 385, 392–93 (1867) (holding that a "clerk in the office of the assistant treasurer of the United States" was an officer because his "duties were continuing and permanent, not occasional or temporary" and "[v]acating the office of his superior would not have affected the tenure of his place").

In reply, Defendants may cite to decisions concerning a special prosecutor, *United States v. Donziger*, 38 F.4th 290, 296–99 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 868 (2023); independent counsel, *Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988); or a bank receiver, *United States v. Weitzel*, 246 U.S. 533, 541 (1918), to assert that relators occupy a continuing position. Those cases, however, do not

support the notion that an FCA relator occupies a "continuing" position. The bank receiverships and the role of the special prosecutor in *Donziger*, like that of the independent counsel in *Morrison*, were "continuing" in the crucial sense that the roles were not specific to the individuals appointed to perform them: the "duties" of those offices would "continue" even "though the person" performing them "be changed." *Maurice*, 26 F. Cas. at 1214. That is not true of a relator's role.

The duties of a bank receiver, for example, were not limited to performance by a single individual. *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. at 111. If a given person appointed to act as a bank receiver became unable to perform their duties, that would not negate the need for or end a receivership; it would simply require the appointment of another receiver in place of the first. That newly-appointed individual would "continue" the "duties" of the office. In *Stanton v. Wilkeson*, 22 F. Cas. 1074 (S.D.N.Y. 1876), another bank-receiver case, then-Judge Blatchford explains that "[v]acation of office by the comptroller" of the currency, who delegated authority to the receiver, would not "vacate the receivership." 22 F. Cas. at 1074–75.[8]

The same was true of the offices of the independent counsel in *Morrison* and the special prosecutors in *Donziger*. As the Supreme Court explained, Alexia Morrison was not even the first person to hold her office: The court that appointed her had initially appointed James McKay, who had resigned and been replaced by

---

[8] Judge Blatchford later became Justice Blatchford and authored the Supreme Court's seminal opinion in *Auffmordt*, quoted, *supra*, at 14.

15

her. *Morrison*, 487 U.S. at 667. Ms. Morrison's role was thus clearly "continuing," even though it was not permanent. And in *Donziger*, the Second Circuit—citing *Maurice*—specifically based its ruling on the premise that "the individuals appointed as special prosecutors could be replaced without the duties of the positions terminating." 38 F.4th at 297. The role of a *qui tam* relator under the FCA is nothing like that. If a particular relator who has blown the whistle on a fraud by filing a *qui tam* action decides she is no longer interested in pursuing the action, another person cannot simply take her place as relator. The FCA states expressly that "[w]hen a person brings an action under" the *qui tam* provisions, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).

Although a relator's *qui tam* action survives her death and may be pursued by her estate's personal representative, *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993), this only underscores that a relator's interest in a *qui tam* action is simply an interest in her assigned share of the ultimate monetary recovery. The duties of an actual government office—for example, "an Attorney General, an Ambassador, or [a] Secretary of the Treasury," *Zafirov*, 751 F. Supp. 3d at 1314—cannot be assigned and are not inherited by the official's estate if she dies. Nor can the official reassign her duties to, say, a trusted friend.

Because *qui tam* relators do not occupy a continuing position, they are not officers of the United States. Accordingly, they are not "appointed" in the

Constitutional sense, and therefore, the FCA *qui tam* provisions do not violate the Appointments Clause.

## CONCLUSION

As set forth above, the FCA's *qui tam* provisions are consistent with the Constitution. The Court should reject defendants' arguments—as every federal Circuit Court to address these issues has done—and deny so much of defendants' motion as alleges unconstitutionality of the *qui tam* provisions of the FCA.

Dated: Newark, New Jersey
      April 4, 2025

                                      Respectfully Submitted,

                                      ALINA HABBA
                                      United States Attorney

By:   */s/ David V. Simunovich*
         DAVID V. SIMUNOVICH
         Assistant United States Attorney